Filed 4/2/19; Modified and Certified for Partial Publication 7/3/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| M.L. et al.,<br><br>　　　　Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>　　　　Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>　　　　Real Party in Interest. | A156130 & A156149<br><br>(San Mateo County Super. Ct. Nos.<br>　17-JD-1079/JUV83889<br>　17-JD-1080/JUV83890) |

　　　　In this consolidated juvenile writ proceeding, both M.L. (mother) and M.C. seek extraordinary relief from the juvenile court orders removing their daughter K.C. for a second time—after an extended period of child welfare services—and setting a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Mother also seeks similar writ relief with respect to her older son, K.B.[2]  Specifically, petitioners argue that the juvenile court's setting order must be reversed because the court's decision to remove K.B. and K.C. from the family home went beyond

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.  All rule references are to the California Rules of Court.

[2] K.B.'s alleged father, D.B., has not been a significant presence in K.B.'s life.  He was tangentially involved in the proceedings below, but raises no challenge here to the juvenile court's orders.

the scope of the modification request before the court, there were reasonable means short of removal to protect the minors, and the minors' possible Indian heritage was not properly investigated or notice provided to relevant tribes as required under the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. § 1901 et seq. Finding no merit to any of the petitioners' contentions, we deny the petitions.

## I. BACKGROUND

These proceedings began on May 1, 2014, when Contra Costa County Children & Family Services (Contra Costa CPS) filed dependency petitions pursuant to subdivisions (b) and (g) of section 300, seeking the detention of both K.B. (born in 2008) and K.C. (born in 2011). On March 4, 2014, San Francisco police encountered mother, who had been wandering the streets aimlessly with the two minors for over 12 hours. Both children appeared disheveled, the minors were complaining they were hungry, and mother had no food or extra clothing for them. The maternal grandfather picked up the children from the police station and took them home, but mother refused to accompany them. After the maternal grandparents failed to hear from mother for a month, they filed a missing persons report. The whereabouts of both fathers, D.B. and M.C., were also unknown. According to the maternal grandparents, mother had struggled with drug abuse for several years and was in a relationship with M.C. that was characterized by domestic violence. The children were formally detained by the juvenile court on May 2, 2014.

Mother and M.C. were located at the home of the paternal grandparents in San Mateo County. They appeared before the juvenile court at a hearing in early July, and the court declared M.C. to be K.C.'s presumed father. Petitioners did not contest the petition, a modified version of which was sustained at the jurisdictional hearing on July 25, 2014. The matter was then transferred to San Mateo County for disposition.

The dispositional report filed by the San Mateo County Human Services Agency (Agency) indicated that mother was homeless after an August 2014 domestic violence incident with M.C., which led to arrests for both on domestic violence and drug possession charges. Mother reported M.C. " 'punched and stomped her in the chest' " and so she " 'cracked him over the head' " with a bong. Mother admitted consistent past

2

methamphetamine use with M.C. She told the social worker she no longer used methamphetamine, but did drink alcohol. She reported a diagnosis of schizophrenia and stated she often heard voices. Mother was pregnant with M.C.'s second child and, according to the social worker, her focus appeared to be on rekindling her relationship with M.C.

Disposition was contested and continued several times. While the matter was pending, mother cooperated with the social worker, attended counseling, and tested clean for all controlled substances. Given mother's progress, she was allowed to live in the maternal grandparents' home along with the children, who were reported to be thriving. At the dispositional hearing held on February 10, 2015, the juvenile court removed K.B. and K.C. from parental custody, declared the minors juvenile court dependents, and placed them in the home of the maternal grandparents. Reunification services were ordered.

In advance of the June 2015 combined six- and 12-month review, the social worker reported that mother continued to do well and had given birth to her third child in February 2015. At the June hearing, the juvenile court authorized mother to have unsupervised visits with K.B. and K.C., gave the Agency discretion to return the children to mother, and continued the matter for further hearing. At the continued hearing in September 2015, the juvenile court returned the minors to mother's custody, ordered family maintenance service for mother, terminated family reunification services for both M.C. and D.B., and ordered the case transferred back to Contra Costa County.

Family maintenance reviews continued for several years. In March 2016, the family remained in the home of the maternal grandparents. Mother admitted using a belt to physically discipline the minors, was educated by the social worker, and agreed to refrain from using further physical discipline. Intensive family preservation services were provided to mother to support her in parenting the minors. In September 2016, mother and her children moved in with M.C. at the home of the paternal grandparents, after being locked out by the maternal grandparents. As a result, family maintenance services were ordered for both mother and M.C. in October 2016. By March 2017,

3

mother sought additional assistance from K.B.'s therapist due to incidents of enuresis (bed wetting) and encopresis (soiling). She reported M.C. had been yelling and hitting K.B. In May 2017, M.C. admitted smacking K.B. on the side of the head once or twice. K.B. confirmed physical punishment from M.C. and almost daily verbal arguments in the house. Mother gave birth to her fourth child (her third with M.C.) in August 2017. Mother had recently stopped K.B.'s therapy services, as she believed they were not helpful. Thereafter, K.B. was psychiatrically hospitalized in September 2017 after he expressed suicidal ideation at school and disclosed plans to cut himself with a kitchen knife. He was discharged with prescribed medications and a diagnosis of, among other things, ADHD, nocturnal enuresis, and posttraumatic stress disorder. In October 2017, M.C. reported mother was drinking and did not feed the infant. In December 2017, the case was transferred back to San Mateo County.

In advance of the July 2018 six-month review hearing in San Mateo County, the Agency social worker recommended continuing family maintenance services due to a number of unresolved family issues, including the way both mother and M.C. communicated with and disciplined the children, their parenting techniques, and their ability to respond to the children's emotional needs. The social worker was assisting the family in a move to shelter housing as the paternal grandmother was not being supportive of the parents and it was not a good environment for the family.

In September 2018, however, the social worker filed a modification petition pursuant to section 388 seeking additional court orders with respect to father. M.C. was reportedly waking K.B. multiple times at night because of his frequent bed wetting. Mother confirmed M.C. would make K.B. stay on the toilet for an hour, slap him, verbally abuse him, and turn off the light for several minutes at a time. K.B. stated he did not feel safe with M.C. and reported that M.C. had hit him, had put his hands around his neck while calling him " 'retarded,' " and had hit mother with a speaker during an argument, giving her a swollen eye. Mother confirmed the domestic violence incident and admitted she hit M.C. back. The social worker's petition requested that M.C. be ordered to stay away from the family for a period of time, refrain from speaking to K.B.

4

about his enuresis, and be required to engage in individual therapy, parenting classes, drug testing, and a psychological evaluation. All parties stipulated to the request and the court granted the petition.

When mother, the social worker, and K.B. met with a doctor in September regarding K.B.'s enuresis, mother was not open to considering medication for the problem, refused to restrict his liquids in the evening, and appeared to be less than candid with the doctor about the scope of the problem. In addition, the social worker met repeatedly with K.B.'s principal about K.B.'s aggressive and inappropriate school behaviors after the parents had not returned the school's phone calls. Although it appeared K.B. had difficulties on days he was not given his ADHD medication and the school offered to give it to him, mother declined the offer.

In October 2018, one of K.C.'s younger siblings told the social worker that K.C. was crying because M.C. had grabbed her by the hair and pulled her off the top bunk of the bed, apparently upset that K.C. had been slow in getting out of bed. K.B. tried to stop this disclosure, saying he would get in trouble for allowing it because mother and M.C. had instructed him not to tell the social worker anything. K.B. elaborated that mother blamed him for almost losing her job after he reported M.C.'s abuse, and mother stressed that if M.C. was not allowed to return to the shelter, she would lose her job and they all would become homeless. That same month, M.C. spoke to K.C. harshly for saying she was hungry and hit K.B. on the arm, causing a red mark. The social worker noted that K.C. was often crying. Mother and K.B. both reported that M.C. hit mother while in the car, and mother's eye was injured in what appeared to be another incident of domestic violence. The social worker called 911 after a phone call in which M.C. appeared to be experiencing psychotic symptoms and had reportedly locked K.B. and mother in the bathroom. Mother denied that M.C. had mental health issues despite staff requiring M.C. to leave the shelter due to his unstable behavior. When M.C. was psychiatrically hospitalized, mother stated that he was "faking it" so that he could avoid his responsibilities to his children.

5

There were also multiple indications that the children were not being regularly fed or cared for. After M.C. was temporarily barred from the shelter, staff had to bring food to the children on several occasions while mother remained in bed. On one occasion, shelter staff entered the unit after hearing the infant minor crying for 40 minutes. They found mother asleep. When K.C. presented with a wheezing cough, the social worker took her to the emergency room to get necessary medication after mother refused to take her. In addition, mother admitted to drinking alcohol, despite taking psychotropic medications for schizophrenia. Mother reportedly pulled K.C.'s hair and yelled at her for disclosing to the social worker that the infant minor had fallen into the toilet and "almost drowned" but she (K.C.) had pulled him out. That same night, M.C. reported that the infant had also fallen off the bed.

Circumstances deteriorated further in November. M.C. was denying that he needed therapy. He claimed that K.B. was the source of the family's problems and that they would all be better off without him. He reported that mother would often sing and talk loudly to herself late into the night and then fail to get up on time in the morning, leaving him to help the children get ready for school. Mother continued to forget to give K.B. his medication and failed to wake him up during the night. K.B. was thus wetting the bed almost daily. The parents had not followed through with the family therapist, who had been tasked with helping them create a schedule to decrease morning stress. While arguing with M.C. in front of the social worker, mother lamented: " 'I always protect you and I don't talk about what you do to me but you can't wait to stab me in the back.' " According to the social worker, mother appeared to have difficulty addressing M.C.'s abusive behavior towards K.B.—she recognized the mistreatment, but expressed that it would be "unfair" for M.C. "to be freed of his parental responsibilities to care for his children." When the social worker noted this was at the expense of K.B.'s well-being, mother responded that K.B. was "fine." Mother stated she did not need further services. The social worker described the family as being "in crisis" and stated that M.C. was not engaging in services and mother refused to examine her neglect of her children.

6

Nevertheless, the Agency recommended that the situation be monitored and further family maintenance services be offered.

K.B.'s attorney disagreed, filing a modification petition pursuant to section 388 in November 2018, which requested that the children be detained because they were at risk of harm in the family home. A combined review hearing and hearing on K.B.'s modification petition was held on December 11, 2018. It was stipulated that if K.B. were to testify he would state he would prefer to stay in the home. After testimony from mother, M.C., and the social worker, the court heard argument, asking the parties to focus on whether the minors could safely remain in the home if father was ordered to move out. Counsel for K.B., K.C., and D.B. all argued in favor of removal of the minors. Agency counsel noted that if the minors were removed, the parents would not be entitled to additional services, given the years of services that had already been provided.

In ruling on the petition to modify, the juvenile court initially noted it had been its hope to continue family maintenance services and enter some orders, such as removing M.C. from the home. However, in reviewing the evidence presented, the court described the situation with the children as "volatile" and "dire," cited instances of mother's failure to address M.C.'s abuse of the minors, and noted that mother and M.C. appeared to be resistant to services. The court concluded that the necessary remedy for the minors' well-being was to detain both K.B. and K.C. Remarking it did not make this decision lightly, the court further stated: "The Court has considered other possible alternatives, but determined that based on the parents' performed—past performance, some of their statements, and the other information that's [been] presented, that those other alternatives would not be options that the Court could put in place to eliminate the need for removal." At a follow-up hearing on December 18, 2018, the juvenile court terminated services, finding that the family had received more than 55 months of services since the minors' initial detention. It also found that "particularly more than reasonable services were provided to this family" and that "despite those significant amounts of services, mother and fathers have failed to make substantial progress." It thus set the matter for a hearing

7

pursuant to section 366.26 so that permanent out-of-home placements could be developed for both K.B. and K.C.

Both mother and father filed timely notices of intent to file writ petitions, and the petitions themselves were filed in February 2019.[3] (Rules 8.450(e), 8.452.)

## II. DISCUSSION

### A. *Use of Section 388 Petition to Remove Minors*

We first consider petitioners' contention that the juvenile court's removal order was procedurally defective because it went beyond the scope of the modification request before the court. K.B.'s attorney filed a modification petition pursuant to section 388 in November 2018, requesting a court order that "[K.B.] and sibling(s) be detained." Petitioners claim the juvenile court's subsequent removal of both K.B. and K.C. after hearing on the section 388 petition exceeded the scope of the court's power because the modification request asked for detention rather than removal, terms of art with distinct meanings under the juvenile court law. They additionally argue that K.B.'s attorney did not have standing to request the detention of K.C. We are not persuaded.

Preliminarily, we note petitioners do not claim that a request to remove the minors could only have been initiated by the social worker via the filing of a supplemental

---

[3] In addition to their writ petitions, mother and M.C. also each filed notices of appeal with respect to the challenged orders removing the minors, terminating services, and setting a permanency planning hearing. By order dated January 25, 2019, we consolidated the writ matters (A156130) and the appeals (A156149) for purposes of briefing, argument, and decision. However, "[a]ll orders issued at a hearing in which a section 366.26 hearing is ordered are subject to section 366.26, subdivision (*l*) and must be reviewed by extraordinary writ." (*In re Tabitha W.* (2006) 143 Cal.App.4th 811, 817.) And, where such hearing is a dispositional hearing, "all challenges to the dispositional judgment and underlying jurisdictional findings must be brought by writ" in order to expedite appellate review of the disposition order before the section 366.26 hearing is held. (*Anthony D. v. Superior Court* (1998) 63 Cal.App.4th 149, 153–156.) Although the procedural posture of this matter is somewhat unusual, we conclude our review is best understood as involving jurisdictional findings and dispositional orders—including a setting order—and thus treat the matter as a claim for extraordinary relief rather than an appeal.

8

petition in accordance with section 387.[4]  Nor could they.  (See *Victoria C.*, *supra*, 100 Cal.App.4th at p. 543 [Legislature intended "liberal use" of section 388 procedure "to challenge all types of orders in an ongoing case, including custody and placement orders" and a section 388 petition is "an appropriate procedural tool" for an interested party other than the social worker to seek removal of the minor from a parent]; see also rule 5.560(e)(2) & (3).)  Instead, their arguments address the scope of relief obtainable by the section 388 matter before the court.

It is true the petition requested an order that the minors be "detained" rather than "removed."  However, the modification request went on to state:  "[K.B.] and siblings are at risk of harm.  It is in their best interests to be *removed*, hopefully temporarily . . . ." (Italics added.)  Citing this language in the petition, the juvenile court concluded the petition encompassed both detention and removal.  With respect to standing, the record establishes that the section 388 petition itself indicated that K.C.'s attorney agreed with the request; at the conclusion of the hearing on the petition, K.C.'s attorney aligned herself with K.B.'s attorney and indicated, "I would prefer the kids stay with the mom, but I don't think it's safe"; and K.C.'s attorney confirmed in court the following week that she had verbally joined in the section 388 motion at the previous hearing, a characterization with which the juvenile court agreed.  Under these circumstances, it appears the challenged section 388 petition adequately encompassed the potential removal of both minors.

Even if we construed the court's removal order as exceeding the scope of relief sought by the modification petition, it is nevertheless within the juvenile court's inherent and statutory authority to modify or set aside its orders sua sponte as circumstances warrant, so long as it has provided the parties with notice and an opportunity to be heard.

---

[4] Supplemental petitions may be filed "if the social worker determines the previous disposition order has not been effective and it is necessary to remove 'the child from the physical custody of a parent . . . and direct[] placement in a foster home . . . .' " (*In re Victoria C.* (2002) 100 Cal.App.4th 536, 542–543 (*Victoria C.*), quoting section 387; see rule 5.560(c).)

(§ 385; *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 110–116 (*Nickolas F.*).)  Section 385 provides that "[a]ny order made by the court" in a dependency proceeding "may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article."  Prior to such modification, notice must be provided "to the social worker and to the child's counsel of record, or, if there is no counsel of record, to the child and his or her parent or guardian" in accordance with section 386.

In *Nickolas F.*, the juvenile court granted modification petitions filed on behalf of a dependent minor and the child welfare agency and ordered the termination of family reunification services for the father.  The juvenile court granted the petitions after recognizing it had improvidently directed the agency to provide reunification services to the father, who had been convicted of assaulting his son and was serving a five-year prison term.  By writ petition, the father challenged the court's order on the ground that no " 'change of circumstance or new evidence' " supported it, as required by section 388, subdivision (a).  (*Nickolas F.*, *supra*, 144 Cal.App.4th at pp. 102–103, 105.)

The appellate court agreed that a section 388 petition was not the appropriate means by which to modify the disposition order, but upheld the court's order nonetheless. It reasoned that courts have inherent constitutional authority to carry out their duties, including the power to modify a previous order when necessary to prevent a miscarriage of justice.  (*Nickolas F.*, *supra*, 144 Cal.App.4th at pp. 117–118; see Cal. Const., art. VI, § 1).  A juvenile court is furthermore vested with broad statutory authority to fashion orders concerning the welfare of a dependent child, and, subject to the due process requirements of section 386, to modify its prior orders as appropriate.  (*Nickolas F.*, at p. 111 [citing §§ 19, 202, 245.5]; see § 245.5 ["In addition to all other powers granted by law, the juvenile court may direct all such orders to the parent, parents, or guardian of a minor who is subject to any proceedings under this chapter as the court deems necessary and proper for the best interests of . . . the minor."].)  The appellate court concluded that providing a parent with notice and an opportunity to be heard safeguards the parent's rights to procedural and substantive due process.  (*Nickolas F.*, at pp. 117–118.)

Therefore, using a defective procedural mechanism such as a section 388 petition to modify a prior order did "not affect the validity of the court's ruling" where the juvenile court's determination of the merits underlying the modification were "fundamentally sound." (*Nickolas F.*, at pp. 118–119.)

Petitioners here complain that their due process rights were violated by the procedure followed by the juvenile court. They argue that, once the court detained the minors, it should have ordered the Agency to file a supplemental petition or proceeded in accordance with section 385. As discussed above, however, no supplemental petition was required to initiate the process for removing the children.[5] And the court did proceed pursuant to section 385, as the parents had notice and an opportunity to be heard prior to removal of the minors. Specifically, at the hearing on the section 388 petition, the parents were given the opportunity to challenge the removal request and both mother and M.C. did so—testifying themselves, cross-examining the social worker, and arguing against removal. Moreover, it was clear throughout the hearing that the parents understood what was at stake. Mother testified that, if K.B. and K.C. were detained by the court, K.B. would be unfairly institutionalized and K.C. would be left without her parents "to guide her in the right direction in life." In response to questioning regarding how he felt at the prospect of K.B. and K.C. being removed from the family, M.C. stated it would be "the worst possible thing for both of them." And, during argument, mother's attorney stressed: "[I]f they are removed, because of the time lines, we don't—we'd be

---

[5] The juvenile court also followed a process equivalent to what would have occurred under a supplemental petition. If, during the " 'jurisdictional phase' " of a hearing on a supplemental petition, the juvenile court finds that the previous disposition has not been effective in protecting the child, a separate " 'dispositional' " hearing is conducted to determine whether a more restrictive level of custody is appropriate. (*In re Jonique W.* (1994) 26 Cal.App.4th 685, 690–691; see rule 5.565(e).) By ordering the minors detained, the juvenile court implicitly found that the previous disposition had not been effective in their protection. The court then properly supported its removal order— finding, by clear and convincing evidence, that the minors were at substantial risk of both physical and emotional harm if they remained in the family home. (See § 361, subd. (c)(1) & (3).) Nothing further was necessary. (See *Victoria C.*, *supra*, 100 Cal.App.4th at p. 543.)

looking at setting this for a termination of parental rights hearing. This isn't just a regular detention where we can return. This is basically breaking up a family permanently."

To summarize, the juvenile court was well within its inherent and statutory authority to modify the disposition and order removal of the children as relief for the section 388 modification petition. Fairly read, the petition itself indicated that removal was in the best interests of the children, and counsel for both minors supported the request. Petitioners had notice and an opportunity to challenge the removal request at the section 388 hearing, including the right to present evidence and to confront witnesses, and they did so. Petitioner's due process rights were safeguarded, and we find no procedural defect in the juvenile court's removal order.[6]

### B. Reasonable Means to Protect Short of Removal

Petitioners next argue that the juvenile court erred in removing K.B. and K.C. from the family home because M.C. was willing to move out, providing a reasonable means to protect the minors short of removal. In order to remove a dependent child from a parent's home, there must be clear and convincing evidence of a substantial danger to the child's health, safety, or physical or emotional well-being that cannot be eliminated by reasonable means. (*In re J.C.* (2014) 233 Cal.App.4th 1, 6; *In re H.E.* (2008) 169 Cal.App.4th 710, 718–723; see § 361, subd. (c)(1) [prior to removal court must find that "there are no reasonable means" short of removal that would adequately protect the child].) " 'A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. . . . The court may consider a parent's past conduct as well as

---

[6] Petitioners' additional argument—that the parents were entitled to a 30-day continuance of the dispositional phase of the hearing at which their services were terminated—is not well taken. Section 358, subdivision (a)(3), provides that the juvenile court "shall continue the proceedings for a period not to exceed 30 days" when a social worker is requesting bypass of reunification services pursuant to subdivision (b) of section 361.5. (See rule 5.684(f).) This was not a bypass case. Rather, the parents had exhausted the applicable timelines and thus were not entitled to additional reunification services.

present circumstances.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) On appeal from an order removing children from their parents, "we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re Noe F.* (2013) 213 Cal.App.4th 358, 367.)

In the present case, we have no difficulty concluding that substantial evidence supports the juvenile court's removal order. As detailed at some length above, mother had failed to protect the minors and herself from M.C.'s significant physical and emotional abuse. In addition, despite many years of services—both in these proceedings and in prior proceedings in San Francisco County—mother appeared unable to provide for her children's safety, emotional well-being, or basic needs, was resistant to services for the family, and refused to recognize the neglect and abuse the children were experiencing. Instead, she was essentially in the same place she had been when K.B. and K.C. were first detained back in May 2014. And the physical and emotional toll on her children as a result of her neglect and failure to protect is apparent. The situation had become dire, by the juvenile court's own estimation, and while the court's determination carried serious consequences, its analysis was thoughtful and its decision to remove the minors was made only after express consideration of available alternatives, including removing M.C. In sum, substantial evidence supports the juvenile court's conclusion that K.B. and K.C. would be at substantial risk of harm if they remained with mother in the family home, even in the absence of M.C.

### C. Adequacy of ICWA Noticing

Petitioners finally assert the juvenile court's setting order should be set aside due to the Agency's inadequate investigation of the maternal great-grandmother's Indian heritage and concomitant failure to comply with ICWA notice requirements. ICWA mandates that a child's Indian tribe be notified of a dependency proceeding and its right to intervene whenever there is a "reason to know" a child is an Indian child. (*In re A.G.* (2012) 204 Cal.App.4th 1390, 1396; see 25 U.S.C. § 1912(a); §§ 224.2, subds. (d) & (f), 224.3, subd. (a).) Circumstances that provide such a reason to know include the

situation where "[a] person having an interest in the child, including . . . a member of the child's extended family informs the court that the child is an Indian child." (§ 224.2, subd. (d)(1).) If circumstances "indicate a child *may* be an Indian child, the social worker must further inquire regarding the child's possible Indian status. Further inquiry includes interviewing the parents, Indian custodian, extended family members or any other person who can reasonably be expected to have information concerning the child's membership status or eligibility." (*In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539, italics added; see § 224.2, subd. (e).) Only when further inquiry leads the court or the social worker to "know or have reason to know an Indian child is involved" is formal notice to the relevant tribes required. (*Shane G.*, at p. 1539; see §§ 224.2, subds. (d) & (f), 224.3, subd. (a).)

Here, the dependency petitions filed in May 2014 in Contra Costa County included the information that, according to the maternal grandmother, the minors' maternal great-grandmother was registered with the Eastern Band of Cherokee Indians, the United Keetoowah Band of Oklahoma, and the Seminole Tribe of Florida. However, there is no indication in the record that ICWA notices were sent, either by the Agency or by Contra Costa CPS. Nevertheless, at the February 2015 dispositional hearing, the juvenile court found ICWA inapplicable to both minors. Petitioners argue this was error, as the pertinent social workers had a duty to investigate the maternal grandmother's claims of Indian heritage and then provide appropriate notice to all relevant tribes.

We agree with petitioners that the maternal grandmother's statements regarding Indian heritage triggered the duty to investigate further. However, the record—which petitioners ignore—clearly indicates that further inquiry was made. Specifically, in a July 2014 memorandum to the court, Contra Costa CPS reported that mother and M.C. had a previous child welfare case involving family reunification and family maintenance services in San Francisco County in 2009 and 2011. Contra Costa CPS spoke extensively to the family's previous San Francisco social worker, who was able to discuss the family history of both mother and M.C. at length, as she had worked with them for many years. According to this social worker, the ICWA process was completed by San Francisco

14

County and *the children were not eligible*. The Agency's October 2014 dispositional report additionally specifies that, in 2009, the San Francisco juvenile court expressly found that ICWA did not apply to K.B. Presumably, this finding would apply equally to any Indian heritage K.C. received from mother, the only Indian ancestry suggested in this matter. Finally, the dispositional report also details September 2014 statements to the Agency from both the maternal grandmother and mother confirming that the minors are not registered as Indian children. Since it is clear that both Contra Costa CPS and the Agency appropriately investigated the minors' possible Indian status and determined there was no reason to know either minor was an Indian child, ICWA noticing was not required in this case. The juvenile court's conclusion that ICWA did not apply is thus amply supported by the record.

## III. DISPOSITION

The petitions are denied on their merits. (See § 366.26, subd. (*l*)(1)(C), 4(B).) Because the permanency planning hearing in this matter is set for April 8, 2019, this opinion is final as to this court immediately. (See rules 8.452(i), 8.490(b)(2)(A).) The parents' requests for a stay of the permanency planning hearing are denied as moot.

15

_____
Sanchez, J.

WE CONCUR:


_____
Humes, P. J.


_____
Banke, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| M.L. et al.,<br><br>     Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>     Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>     Real Party in Interest. | A156130 & A156149<br><br>(San Mateo County Super. Ct. Nos. 17-JD-1079/JUV83889 17-JD-1080/JUV83890)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION AND MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on April 2, 2019, was not certified for publication in the Official Reports. Having received a request for publication, and after the California Supreme Court granted review on its own motion and transferred the matter back to us for further proceedings (California Rules of Court, rules 8.512(c)(1) and 8.500(b)(4)), it is hereby ordered that the opinion shall be published in the Official Reports, with the exception of Sections II(B) and II(C).

In addition, the opinion is modified as follows: In the first full paragraph on page 8, the first sentence that begins, "Both mother and father filed timely notices . . ." should instead read, "Both mother and M.C. filed timely notices . . . ."

There is no change in the judgment. This order is final as to this court immediately. (See California Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

DATED:                                _____

                                      SANCHEZ, J.

Trial Court:          San Mateo County Superior Court

Trial Judge:          Hon. Susan Jakubowski

Counsel:

Craig Morey, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System, for Minor K.B.

Marianna Slepoy Klebanov, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System, for Minor K.C.

Children's Law Center of California, Leslie Starr Heimov, Amicus Cureae on behalf of Minors K.B. and K.C.

Sherrie Friedman, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System, for Mother M.L.

Joseph Tavano, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System, for Mother M.L.

Regina H. Jett, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System, for Father M.C.

Leslie A. Barrie, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System, for Father M.C.

Law Office of Juris Dumpus, Juris Dumpis, under appointment of the Court of Appeal under the First District Appellate Project, Independent Case System for Father D.B.

John C. Beiers, San Mateo County Counsel, Peter K. Finck, Deputy County Counsel, Attorneys for Real Party in Interest San Mateo County Human Services Agency