Filed 8/16/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| In re I.S., a Person Coming Under the Juvenile Court Law. | |
| --- | --- |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.S.,<br><br>        Defendant and Appellant. | A161417<br><br>(Contra Costa County Super. Ct. No. J1900940) |

R.S. (Mother) appeals the juvenile court's orders declaring her daughter, I.S., a dependent child under Welfare and Institutions Code section 300,[1] and removing I.S. from her custody pursuant to section 361, subdivision (c)(1).  Mother contends the juvenile court erred and deprived her of due process by amending the dependency petition to conform to proof at the jurisdictional hearing.  She also challenges the juvenile court's finding that reasonable efforts were made to prevent the need for I.S.'s removal under section 361, subdivision (e).  We agree with Mother that the juvenile court's

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

amendments to the petition to conform to proof deprived her of due process. Accordingly, we reverse the juvenile court's jurisdictional order and the dispositional orders that derived from it.

## BACKGROUND

### The Petition, Detention, and Jurisdiction

R.S. is the mother of minor I.S. I.S.'s father reportedly lives in Brazil and could not be located.

On October 29, 2019, the Contra Costa County Children and Family Services Bureau (Bureau) initiated these dependency proceedings with respect to then 14-year-old I.S. by filing a petition pursuant to section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse). The petition alleged D.B., a family friend and member of I.S.'s household, touched I.S. on her breast and vaginal area and then forced her to touch his genitals. The petition also alleged Mother "knew about the abuse," but maintained I.S. was " 'a 'liar' " and " '[was] making this up.' " Although Mother initially kicked D.B. out of the home, she later allowed him to move back in, thereby failing to protect I.S. Mother denied the allegations.

On October 30, the Bureau filed its detention and jurisdiction report. Days earlier, the Bureau interviewed I.S., who explained she was abused by D.B., the boyfriend of Mother's sister, approximately a year prior. After that incident, D.B. texted I.S. to not tell anyone about it. I.S. told Mother about the abuse two days afterward and forwarded her the text messages from D.B. At the time of the incident, D.B. lived with I.S., together with several other family members. After I.S. disclosed the abuse to Mother, Mother initiated a meeting with the adult family members in the household to discuss what happened. I.S. and D.B. were present at the meeting. The family members ended up "yelling, screaming and throwing things" and argued about whether

2

they believed I.S. D.B. moved out of the house some time thereafter. However, Mother later asked I.S. "if it was alright for [D.B.] to move back into the home," a question that upset I.S. D.B. eventually moved back into the home in August or September 2019. Although D.B. had not made any advances toward I.S. since moving back, I.S. reported feeling afraid, anxious, and uncomfortable when he is at home. The adults living in the house also stopped speaking to I.S. I.S. often refused to go home and spent many days staying at her school friends' homes. I.S.'s grades also suffered throughout the school year.

During her interview with the Bureau, Mother stated she did not know "why [she was] here." She claimed D.B. "didn't do anything to [I.S.]" and I.S. was a "liar," who was "just making this up because we got into it about her grades this morning." But when asked to elaborate, Mother did not state what I.S. was lying about. Mother confirmed D.B. was living in the family home.

On October 30, the juvenile court ordered I.S. detained, placed her with a foster family, and set a detention hearing for the following day. At the detention hearing, the juvenile court granted Mother weekly visitation, pending the Bureau's completion of a forensic interview. It scheduled a contested jurisdictional hearing for December 4 and a pretrial hearing on November 20.

At the November 20 hearing, the juvenile court was informed that the forensic interview of I.S. recently had been completed. Mother's counsel then requested visitation, which had not yet occurred because a scheduled visit was canceled after I.S. reported she was feeling emotional. I.S.'s counsel objected to the request, explaining that the forensic interview revealed "disturbing" information, which "illuminate[d] [I.S.'s] reluctance to want to

3

see her mother." When the juvenile court asked counsel if the information was "[d]isturbing to the point that you think the visitation order should be revisited," counsel replied that it was, and asked the court to withhold visitation until the parties received feedback from a therapist concerning "what [I.S.] can stand emotionally." Mother objected to the recommendation to suspend visitation pending feedback from a therapist. The juvenile court then stated its decision: "[P]ending further order of the Court, visitation shall only occur if [I.S.] wishes to have a visit. [¶] . . . [¶] . . . [I.S.] is not right now safe with Mother. . . . [¶] . . . [¶] . . . I totally understand where Mom is coming from and I'd—might feel the same way in her situation—but this is about . . . what's in her best interest. And I do find that it is potentially in her best interest, and I give the bureau discretion to determine that as time goes on."

On December 4, the Bureau filed a memorandum detailing statements made by I.S., Mother, their family members, and collateral contacts during the forensic interview and other interviews conducted by the Bureau and law enforcement. Consistent with her statements noted in the detention and jurisdiction report, I.S. explained the events surrounding the sexual abuse in detail, her disclosure to Mother of the abuse and text messages from D.B., the subsequent family meeting, and her family's alienation of her after the disclosure.

Mother denied she knew about the abuse before the dependency proceedings and stated until then, she was only aware of the text messages D.B. had sent I.S. According to Mother, she had asked I.S. if D.B. "had done anything to her" and I.S.'s answer was "no." Mother did not see any text messages that were sexual in nature. Mother, however, stated she herself had been sexually abused in the past and, in light of her experience, D.B.'s

4

text messages were a "red flag." Mother also recalled a time when she heard D.B. was "being creepy" toward I.S. by sitting too close to, and unnecessarily touching, I.S. while playing video games. Mother also stated she called the family meeting to explore the nature of text messages D.B. had sent I.S. At the conclusion of the meeting, D.B. apologized to I.S. for making her "uncomfortable," and I.S. apparently accepted the apology. The family also asked I.S. if D.B. could move back into the house, and I.S. responded he could.

I.S. reported feeling depressed since the molestation. She also expressed she was still uncomfortable seeing Mother due to Mother's denial of the abuse, and was concerned about her emotional well-being were she to visit with Mother. The social worker encouraged I.S. to reconsider visits, stated she would check in with I.S. at the end of the week to set up visits for the following week, and suggested I.S. try communicating with Mother in writing. I.S. was open to that idea.

At the December 4 hearing, the parties notified the juvenile court they had negotiated a jurisdictional resolution whereby the allegation in count d-1 in the petition stating I.S. had been sexually abused by a member of her household would be admitted, and all other allegations would be dismissed. The juvenile court rejected the proposed resolution because it stripped the petition of language describing Mother's "personal responsibility for [Mother's] role in getting us to where we are."

Mother's counsel then requested visitation. I.S.'s counsel objected to the request, explaining I.S. was "simply not ready yet" to see Mother. The juvenile court then stated, "I don't know that I have enough information about whether to be heavy-handed with visitation. The most comfortable I am willing to get is ordering that the bureau shall make all efforts to try to

5

facilitate therapeutic visitation when [I.S.] is ready. And I can't say that that's in a week, but I will say that. Any objection to that?" No one raised any objections.

The juvenile court continued the contested jurisdictional hearing to January 2, 2020. Due to delays and court closures associated with the COVID-19 pandemic, the hearing took place over the course of several days between January 2 and July 1. Mother, her family members, and social workers testified.

Mother testified along the lines of her previous statements to the Bureau and law enforcement in interviews, including her denial of the abuse. Mother also testified that after D.B. moved back into the family home, she continued living there until December 2019, when her family "kicked [Mother] out."

Social worker Laura Carnagey testified about the interactions between Mother and I.S. during a Child and Family Team (CFT) meeting in January 2020—the first time they saw each other since detention. I.S. expressed her worries to Mother. In response, Mother was "defensive and confrontational, and she denied any responsibility." I.S. "became very upset, tearful, crying, somewhat hysterical to the point where she left the room . . . and was in the hallway, and we could audibly hear her sobbing. At which point the first caregiver that [I.S.] was placed with exited and they went into another room to calm her down." The meeting proceeded, but with Mother and I.S. in separate rooms.

At the conclusion of the jurisdictional hearing on July 1, the juvenile court found I.S. was a minor as described by section 300. While it was unclear to the juvenile court whether Mother learned about the reports of abuse before the dependency proceedings, it found "there is more than

6

sufficient evidence to support the following, that the child has suffered or there is a substantial risk that the child will suffer serious physical harm or illness." The juvenile court amended count b-1 in the petition to conform to proof by including the following allegations:

"A, Upon learning an adult male resident in the home, [D.B.], sent the child inappropriate text messages, Mother did not . . . take sufficient steps to investigate the circumstances behind the texts that might have led to the discovery of sexual abuse by that male resident of the home.

"B, Mother involved all the family members in a large, extended household in the discussion of whether to exclude that adult male from the home and, when he was excluded, permitted other family members to ostracize the child within the family home for months because she disclosed the inappropriate text messages that led to his expulsion from the home.

"C, Mother failed to protect the child by placing the child in the middle of the family discussion and decision about whether to permit the adult male to move back into the home and permitting the child to be pressured into agreeing that he can return to the home.

"D, Mother failed to protect the child by remaining in the home with the child after the adult male moved into the home.

"E, Mother continued to live in the home with the adult male even after learning that the child disclosed sexual abuse by the adult male in addition to the inappropriate texts.

"And, F, the child feels so unsupported by Mother that the child doesn't feel safe living with Mother."

As so amended, the juvenile court sustained the count b-1 allegations. It did not discuss count d-1 at the hearing, but its written order noted it was dismissing that count. It then set the dispositional hearing for July 22.

7

At the July 22 hearing, the Bureau asked the juvenile court to clarify its jurisdictional findings because it was unclear if it had made any findings with respect to count d-1. The juvenile court agreed its findings were unclear and stated it would review the transcript and findings, and issue an order clarifying its findings.

At a pretrial hearing on August 5, the juvenile court stated, "because we were under time pressure because it was the end of the day, I neglected to address the (d)(1) allegations. . . . And I had just overlooked the (d) allegations." The juvenile court announced it was amending count d-1 of the petition to conform to proof at the jurisdictional hearing by including the following allegations: "The parent has failed to protect the child adequately from sexual abuse and the parent knew or reasonably should have known that the child was in danger of sexual abuse in that:

"a. The child was sexually abused by an adult male resident of the home, [D.B], who touched the child on her breast and vaginal area, then forced her to touch [D.B.'s] genitals.

"b. Mother learned that [D.B.] sent the child inappropriate text messages, but Mother did not take sufficient steps to investigate the circumstances behind the texts that reasonably might have led to the discovery of sexual abuse, and would have at least revealed the danger of sexual abuse of the minor by [D.B.]

"c. Mother failed to protect the child by placing the child in the middle of the family discussion and decision about whether to permit the adult male to move back into the home, and permitting the child to be pressured into agreeing that he could return to the home.

"d. Mother failed to protect the child by remaining in the home with the child after the adult male moved into the home.

"e.  Mother continued to live in the home with the adult male even after learning that the child disclosed sexual abuse by the adult male in addition to the inappropriate texts."

The juvenile court sustained the amended allegations and continued the dispositional hearing to September 30.

**Disposition**

The Bureau filed its dispositional report, which attached a copy of Mother's case plan.  It noted I.S.'s diagnosis of post-traumatic stress disorder, as well as her difficulties with sleep, low self-esteem, and self-harming thoughts.  The Bureau recommended the juvenile court find I.S. continued to be a dependent child under section 300; adjudge her to be a dependent; determine reasonable efforts were made to prevent the need for removal; find, pursuant to section 361, subdivision (c)(1), by clear and convincing evidence, there was a substantial danger to the physical health, safety, protection or physical or emotional well-being of I.S. or would be if I.S. were returned home, and there were no reasonable means by which the I.S.'s physical health could be protected without removing I.S. from Mother's custody; and grant Mother supervised visitation four times per month.

The juvenile court held the dispositional hearing on September 30. After hearing testimony from social worker Yecenia Parra on the Bureau's efforts to provide I.S. and Mother with services, the parties presented closing arguments.  Mother's counsel argued that the Bureau failed to meet its burden to establish reasonable efforts were made to prevent I.S.'s removal from Mother's custody—a finding counsel asserted must be made by clear and convincing evidence.

Following that argument, the juvenile court announced its decision "to adopt the recommendations [of the Bureau] on pages 16 through 18 of the

report as the findings and orders of the Court," which included the finding that clear and convincing evidence established there was a substantial danger to the physical health, safety, protection, or physical or emotional well-being of I.S. if she were to be returned home, and there were no reasonable means by which I.S.'s physical health could be protected without removal.

The juvenile court also found the Bureau made reasonable efforts to prevent the removal of I.S. from Mother's custody and rejected Mother's assertion that such a finding must be made under the clear and convincing evidence standard.

Mother appeals from the jurisdictional and dispositional orders.

## DISCUSSION

### The Juvenile Court Erred in Exercising Jurisdiction Over I.S.

Mother contends the juvenile court erred and deprived her of due process when it amended the dependency petition to conform to proof produced at the jurisdictional hearing to include allegations based on factual and legal theories not at issue in the original petition. We agree.

"Since the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford [the parent] adequate notice and an opportunity to be heard." (*In re B.G.* (1974) 11 Cal.3d 679, 688–689; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) "[A] parent whose child may be found subject to the dependency jurisdiction of the court enjoys a due process right to be informed of the nature of the hearing, as well as the allegations upon which the deprivation of custody is predicated, in order that he or she may make an informed decision whether to appear and contest the allegations."

10

(*In re Wilford J.* (2005) 131 Cal.App.4th 742, 751.) "Notice of the specific facts upon which the petition is based is necessary to enable the parties to properly meet the charges." (*In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397.)

A juvenile court may amend a dependency petition to conform to the evidence received at the jurisdiction hearing to remedy immaterial variances between the petition and proof. (§ 348; Code Civ. Proc., § 470.) However, material amendments that mislead a party to his or her prejudice are not allowed. (Code Civ. Proc., §§ 469–470; *In re Andrew L.* (2011) 192 Cal.App.4th 683, 689 (*Andrew L.*).)

"Given the haste with which petitions are sometimes drafted, . . . the ability to amend according to proof plays an important role in the overall dependency scheme. If a variance between pleading and proof—to use the traditional term of art from civil law [citation]—is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment. [¶] The basic rule from civil law, however, is that amendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041–1042 (*Jessica C.*).)

"[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused." (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; see *Jessica C.*, *supra*, 93 Cal.App.4th at p. 1043.) "While the abuse of discretion standard gives the trial court substantial latitude, '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the

11

subject of [the] action . . . .” ’ [Citation.] ‘Action that transgresses the confines of the applicable principles of law is outside the scope of discretion.’ ” (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119 (*Nickolas F.*).)

*Jessica C.* illustrates the type of amendment that is appropriate in the dependency context. There, the social services agency filed a petition alleging the minor's father had "penetrated his daughter's vagina with his penis," but the child later testified that the father had only "touched her vagina with his penis . . . ." (*Jessica C.*, *supra*, 93 Cal.App.4th at p. 1040.) The juvenile court denied the agency's request to amend the petition by substituting "touching" for "penetrating." (*Ibid.*) The appellate court reversed, holding the proposed amendment would not have prejudiced the father since it involved conduct and legal theories nearly identical to the original allegations. (*Id.* at p. 1042.) The court reasoned: "Here, it cannot be seriously maintained that [father] would possibly have prepared his defense differently if the allegation had been that he had 'touched' his daughter's vagina with his penis, as distinct from 'penetrated.' The basic allegation was there, and any variance between 'touching' and 'penetrating' could not have misled him to his detriment. Both allegations are heinous, and entail the intimate violation of a child." (*Ibid.*)

In *Andrew L.*, *supra*, 192 Cal.App.4th 683, the court held it was not prejudicial error to conform the petition to proof by striking entirely a section 300, subdivision (a), count, as well as the specific allegation of a diagnosis of a subdural hematoma caused by trauma in the subdivision (b) count, when the remaining subdivision (b) allegations that the child was at substantial risk of serious physical harm or illness were proved. (*Id.* at pp. 689–690.)

And in *In re David H.* (2008) 165 Cal.App.4th 1626 (*David H.*), the court held a petition under section 300, subdivision (a), that alleged the child had suffered serious physical harm inflicted non-accidentally by his mother

12

could properly be amended to conform to the proof presented at the hearing that the child faced a current substantial risk of harm if returned to the mother's custody. (*Id.* at pp. 1644–1647.)

Thus, in each of these decisions endorsing a liberal rule for allowing amendments to conform to proof, the gravamen of the dependency petition remained the same.

By contrast, in *In re G.B.* (2018) 28 Cal.App.5th 475 (*G.B.*), the juvenile court exceeded its authority to amend the petition to conform to proof. The court's amendments included allegations that "completely changed the grounds for establishing jurisdiction over G.B. Specifically, the court's allegations sought to establish jurisdiction over G.B. under a different legal theory than the original allegations (emotional abuse versus sexual abuse); they named father as an offending parent even though he was nonoffending in the original petition; and they were based on a set of facts not at issue in the original allegations (father's alleged coaching of G.B. to fabricate allegations against mother and her boyfriend versus the boyfriend's alleged sexual abuse and mother's failure to protect G.B. against that abuse)." (*Id.* at p. 486.)

In reviewing the juvenile court's amendments to the petition here, we find this case closer to *G.B.* than *Jessica C.*, *Andrew L.*, or *David H.* The juvenile court's amendments did not incorporate the same "basic allegation" at issue. Rather, the court's newly-added allegations sought to establish jurisdiction over I.S. under a different legal theory than the original allegations. Specifically, the allegations in amended count b-1, paragraphs (b), (c), and (d), essentially sought to establish jurisdiction based on Mother's infliction of emotional abuse—a distinct basis for jurisdiction available under

13

section 300, subdivision (c),[2] which was not alleged in the original petition. (See *In re Jesus M.* (2015) 235 Cal.App.4th 104, 112 [subdivision (b) provides for jurisdiction based on physical, not emotional, harm].) Although I.S.'s emotional problems were discussed throughout the proceedings, Mother had no notice evidence should be presented concerning the nature and severity of any emotional damage I.S. may have been suffering, as well as Mother's responsibility for the initial onset and continuation of I.S.'s emotional damage.

Mother also challenges the juvenile court's amendments to include count b-1, paragraph (a), which alleged: "Upon learning an adult male resident of the home, [D.B.], sent the child inappropriate text messages, Mother did not take sufficient steps to investigate the circumstances behind the texts that might have led to the discovery of sexual abuse by that male resident of the home." Count b-1 originally alleged Mother "knew" I.S. had been sexually abused because I.S. "reported" the abuse to her, and then, knowing that information, "forc[ed] the child to live with her abuser." While these amendments present a closer question on whether they materially varied from the original petition, we find they fall on the *G.B.* side of the line. We agree with Mother that "[t]hese are entirely different theories: *actual* knowledge contrasted with a conclusion that a reasonable investigation *might have led* to discovery of sexual abuse . . . ." In particular, the amendment alleges a more attenuated theory of notice based on different

---

[2] Section 300, subdivision (c), provides that a child comes within the jurisdiction of the dependency court if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care."

facts—that through a reasonable investigation into D.B.'s texts, Mother would have learned of facts, which, at most, raised a generalized prospect or possibility sexual abuse occurred. If Mother's lack of diligence and the mere possibility of her knowing about the sexual abuse had been alleged as a basis for her failing to protect I.S. against the risk of repeated sexual abuse, then Mother "would possibly have prepared [her] defense differently." (*Jessica C.*, *supra*, 93 Cal.App.4th at p. 1042.) We thus conclude the juvenile court's amendments to the section 300, subdivision (b) allegations materially varied from the original petition to Mother's detriment.

This leads us to the Bureau's argument that "even without reaching the alternative basis for jurisdiction based on Mother's failure to protect the child, . . . the juvenile court properly assumed jurisdiction in this case" under section 300, subdivision (d). Section 300, subdivision (d) provides a basis for jurisdiction if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse." The Bureau asserts that Mother did not "challeng[e] the evidence that [I.S.] had been sexually abused by a member of her household." It also points to evidence that Mother did not move out of the family home while D.B. was also living there, even after learning about the sexual abuse for the first time through the dependency proceedings. As such, the Bureau asks us to apply the following principle stated in *In re Alexis E.* (2009) 171 Cal.App.4th 438: "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of

jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." (*Id.* at p. 451.) The Bureau goes on, "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate." (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)

We decline to apply those principles here, in light of the procedure by which the juvenile court amended count d-1 of the petition, a procedure that the court itself described as an "irregularity"—a procedure, we conclude, that ultimately prejudiced Mother.

As discussed above, the juvenile court initially dismissed count d-1 in its entirety based on insufficient evidence, only to reinstate it over Mother's objections, and then substantially amend it, more than one month after the close of evidence. Specifically, at the conclusion of the jurisdictional hearing on July 1, 2020, the juvenile court dismissed count d-1 by written order. At the hearing, the court explained, "I think that the evidence is not clear enough to sustain the petition as initially alleged, . . . because it is not clear that the child did, in fact, disclose the abuse to Mother before it was disclosed to the social workers. [¶] Her CIC interview is not super clear on that point, and the evidence is just not sufficiently clear for the court to find true the allegations as stated."

At the hearing on July 22, the Bureau asked the juvenile court for "clarification" of its jurisdiction findings pertaining to count d-1. The juvenile court stated that while it found true "the amendment allegation on the (b) count," it "did not find there was sufficient evidence to sustain the petition as to the (d) count." Despite its prior order expressly dismissing count d-1, the juvenile court stated its findings were not "sufficiently clear" and it would have to "reconstruct what [it] was thinking." The juvenile court then

16

explained, "Honestly, some of the findings that I made on the (b) count could be also findings under (d). I didn't quite put it that way at the time because we were kind of under time pressures, as I recall it." Mother objected to any modification to the petition to reinstate allegations based on section 300, subdivision (d). The juvenile court stated it would review the record and issue an order clarifying its findings.

Then, at the August 5 hearing, the juvenile court, over Mother's objections, reinstated count d-1 and amended it to state allegations similar to those contained in new count b-1 (including the allegation sounding in emotional abuse within the context of the family meeting). The juvenile court stated it had sent the parties its written, amended jurisdictional findings the day before the hearing. The juvenile court apologized for the procedural "irregularity," but nonetheless determined Mother would not suffer any prejudice because "the findings [in amended count d-1] are substantially similar" to those in amended count b-1.

We disagree with the juvenile court that the procedural irregularity surrounding its reinstatement of count d-1 resulted in no prejudice to Mother. A juvenile court has the statutory authority under section 385 to sua sponte change, modify, or set aside a prior order, so long as it provides the parties notice and an opportunity to be heard prior to the modification. (See *In re Brianna S.* (2021) 60 Cal.App.5th 303, 312 ["The sole procedural prerequisite to a juvenile court's exercise of authority under section 385 is that the court 'provide[ ] the parties with notice and an opportunity to be heard' "]; *Nickolas F., supra,* 144 Cal.App.4th at p. 98.) "[P]roviding a parent with notice and an opportunity to be heard safeguards the parent's rights to procedural and substantive due process." (*M.L. v. Superior Court* (2019) 37 Cal.App.5th 390, 400.)

17

Those safeguards were lacking here. Although the juvenile court announced at the July 22 hearing its intent to reconsider its dismissal of count d-1, it did not provide the parties with its actual findings until just one day before the August 5 hearing. In those findings, the juvenile court not only reinstated count d-1 after dismissing it, but it also substantially amended it to include new allegations similar to those in amended count b-1. As a result, Mother lacked sufficient notice of the allegations against her and thus a reasonable opportunity to prepare for the hearing. (See *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212 ["The opportunity to be heard must be afforded 'at a meaningful time and in a meaningful manner' "]; cf. *Andrew L.*, *supra*, 192 Cal.App.4th at p. 689 [amendment to dependency petition did not violate due process where parent had "explicit notice of the issues being litigated" through the social services agency's written section 390 motion].) While Mother voiced her disagreement with the juvenile court's modifications, given the manner in which those modifications came about, the evidentiary portion of the jurisdiction hearing should have been reopened to allow Mother to present evidence to refute the amended allegations. (Cf. *Nickolas F.*, *supra*, 144 Cal.App.4th at p. 117 ["the juvenile court provided Nickolas with notice and an opportunity to be heard, including the right to present evidence and to confront witnesses"]; *M.L. v. Superior Court*, *supra*, 37 Cal.App.5th at pp. 400–401 [at modification hearing, "parents were given the opportunity to challenge the removal request and both mother and M.C. did so—testifying themselves, cross-examining the social worker, and arguing against removal"].)

We therefore conclude the juvenile court's modifications to count d-1 compromised Mother's due process rights to notice and an opportunity to be

18

heard.  Moreover, since the amendments to count d-1, like count b-1, included allegations that materially differed from the original petition, we cannot confidently say Mother had not been misled to her prejudice in maintaining her defense.  Accordingly, we disagree with the Bureau that the juvenile court's findings under section 300, subdivision (d), were "unassailable" and provide an alternative basis to subdivision (b) for affirming jurisdiction. (*In re Ashley B.*, *supra*, 202 Cal.App.4th at p. 979; *In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.)

While we understand the juvenile court's amendments as a well-meaning attempt to protect I.S., we are unable to reconcile the juvenile court's significant changes in the bases proffered for jurisdiction—and the manner in which it made those changes— with Mother's fundamental rights to notice and a fair opportunity to respond to the actual grounds upon which the petition was sustained.  Accordingly, we conclude, on the record before us, the jurisdictional findings under section 300, subdivisions (b) and (d), must be reversed.

### The Dispositional Order Is Also Reversed

Because we conclude that the jurisdictional findings must be reversed, the dispositional order removing I.S. from Mother's custody also must be reversed.  (*In re R.M.* (2009) 175 Cal.App.4th 986, 991.)

### A Remand for Further Proceedings, Rather than Dismissal of the Case, Is the Appropriate Relief on Appeal

Our conclusion, however, does not mean that the Bureau cannot try again.  It is entirely possible that valid grounds exist for the juvenile court to assume jurisdiction over I.S. and, indeed, it may be in her best interests for the court do so.  Further, during the pendency of this appeal, new circumstances may have arisen, or new information may have come to light,

that could affect the juvenile court's evaluation of any new petition filed by the Bureau.

We therefore do not dismiss the dependency action, but instead reverse the jurisdictional findings and dispositional orders, and remand this matter to the juvenile court to allow the Bureau to file a new petition if appropriate, or, alternatively, to seek dismissal of this proceeding. In any further proceedings on remand, the juvenile court should give appropriate weight to all information available concerning I.S.'s and the family's current circumstances.

## DISPOSITION

The jurisdictional and dispositional orders are reversed. The matter is remanded to the juvenile court for further proceedings not inconsistent with this opinion.

_____

Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*In re I.S.* (A161417)

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Honorable Leslie G. Landau |
| Attorney for Plaintiff and Respondent, Contra Costa County Children and Family Services Bureau: | Contra Costa County, Sharon L. Anderson, County Counsel, Carol T. Nguyen, Deputy County Counsel |
| Attorneys for Defendant and Appellant, R.S.: | Gorman Law Office, Seth F. Gorman, by appointment of the Court of Appeal through the First District Appellate Project, Independent Case System |